# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                          DISTRICT COURT DEPT.
                                                        CIVIL ACTION NO.

| | |
|---|---|
| RBM Technologies, Inc., | ) |
| Plaintiff, | ) |
| v. | ) **AMENDED COMPLAINT** |
| Albert L. Lash, IV, | ) |
| Savonix Corporation, | ) |
| Defendants. | ) |

### I. PARTIES

1. The plaintiff, RBM Technologies, Inc. (the "Company"), is a Delaware corporation with a principal place of business at 25 Mount Auburn Street, Cambridge, Massachusetts, Middlesex County, Massachusetts.

2. The defendant, Albert L. Lash, IV ("Lash"), is an individual residing at 32 Bishop Road, Number 4, Quincy, Norfolk County, Massachusetts.

3. The defendant, Savonix Corporation ("Savonix") is a Massachusetts corporation with a principal place of business at 32 Bishop Road, Number 4, Quincy, Norfolk County, Massachusetts.

### II. JURISDICTION AND VENUE

4. Pursuant to G.L. c. 223A §2, this Court has direct and personal jurisdiction over Lash, because Lash is domiciled in the Commonwealth of Massachusetts.

5. Pursuant to G.L. c. 223A § 2, this Court has direct and personal jurisdiction over Savonix, because it is organized under the laws of Massachusetts and maintains its principal place of business in Massachusetts.

6. Pursuant to G.L. c. 223 §1, this Court is a proper venue for this action because the plaintiff has a principal place of business in Middlesex County, Massachusetts.

### III. FACTUAL BACKGROUND

7. On or about January 12, 2000, Arthur R. Greene, Jr. ("Greene") incorporated the Company, and is its majority shareholder, President and Treasurer.

8. For over 20 years prior to incorporating the Company, Greene had a successful career developing merchandising presentations for various services and products offered by retail banks.

9. Over his 20-year career, Greene and his company, RBM Systems, Inc. ("RBM Systems"), of which Greene owns 100%, provided the above services to thousands of bank locations nationwide.

10. As a result of his business experience, Greene perceived a need in the market for an internet-based system that would enable banks and other retail businesses to send clear visual directives to their retail locations regarding how to display product and service information, and the Company was incorporated to pursue this business.

11. In the winter and spring of 2001, without any involvement by or input from Lash, the Company developed a working prototype software named Merchandising Manager, which is an internet-based program which enables banks and other retail executives to manage marketing campaigns throughout their retail locations.

12. Since approximately May 2001, the Company has been marketing the prototype software to customers nationwide.

13. On or about August 1, 2001, the Company entered into a written employment contract (the "Contract"), a copy of which is attached to the Verified Complaint and incorporated

2

herein by reference as Exhibit A, with Lash, pursuant to which he served as the Company's Vice President and Managing Director of Technology.

14. As the Company's Vice President and Managing Director of Technology, pursuant to the Contract, Lash was "responsible for the development, coding and implementation of software for use by and licensing by the Company to its customers, and . . . [was required to] discharge such duties and responsibilities as are customary for the chief technology officer of a software technology company . . .".

15. Lash's primary responsibility was to refine the Merchandising Manager software.

16. Pursuant to the "Term of Employment" section of the Contract, Lash was required to give not less than thirty (30) days' notice before terminating the Contract.

17. In the "Prohibited Competition" section of the Contract, Lash:

> "agree(d) that during the course of (his) employment with the Company, the Company will furnish, disclose or make available to (him), or (he) will have access to, confidential and proprietary information related to the Company's business. (He) also acknowledge(d) that such confidential information has been developed and will be developed by the Company through the expenditure by the Company of substantial time, effort and money and that all such confidential information could be used by (him) to compete with the Company."

18. In the "Prohibited Competition" section of the Contract, Lash agreed that:

> "in consideration of the Company's agreement to employ (him) and in view of the confidential position to be held by (him) and the confidential nature and proprietary value of the information which the Company may share with (him) . . . that during the entire period which (he) performed services for the Company and for a period of two (2) years following the termination of (his) employment, whether such termination is voluntary or involuntary, that (he) shall not, without the prior written consent of the Company: (a) . . . engage in or have a financial interest in a business which is directly or indirectly competitive with the business of the Company within the United States of America; or (b) . . . solicit, divert or appropriate or attempt to solicit, divert or appropriate . . . any customers, clients or patrons of the Company, or any prospective customers, clients or patrons with respect to which the Company has developed or made a sales presentation (or similar offering of services). . .".

19. In the "Prohibited Employment" section of the Contract, Lash also agreed that:

> "(i) the types of employment which are prohibited by this agreement are narrow and reasonable in relation to the skills which represent (his) principal salable asset both to the Company and to other prospective employers, and (ii) the geographical scope of the provisions of this Section is reasonable, legitimate and fair to (him) in light of the Company's need to market the services and sell its products in that specific geographic area in order to have a sufficient customer base to make the Company's business profitable in light of the limited restrictions and the type of employment prohibited herein compared to the types of employment for which (he is) qualified to earn (his) livelihood."

20. In the "Confidential Information" section of the Contract, Lash agreed that:

> "[he was and would] be in possession of confidential and proprietary information concerning the administrative, management, financial, technical and marketing activities of the Company, including, but not limited to, software, technical data, algorithms, formulae, specialized programs and code, customer lists, procedures, processes, plans, strategies, costs and financial data and other trade secrets of a proprietary nature, including research, development and knowledge regarding the Company's services and products (collectively the 'Confidential Information'). It is recognized that the Confidential Information . . . is a valuable, special, proprietary and unique asset of the Company's business."

21. In the "Confidential Information" section of the Contract, Lash agreed not to disclose:

> "both during and after the term of (his) employment with the Company, any Confidential Information . . . for any reason or purpose whatsoever . . . except for use in connection with the performance of (his) duties and responsibilities hereunder or except as the Company may otherwise permit in writing."

22. In the "Ownership of Ideas, Copyrights and Patents" section of the Contract, Lash

agreed:

> "that all ideas, discoveries, creations, manuscripts and properties, innovations, improvements, know-how, inventions, designs, developments, apparatus, techniques, methods and formulae (all of the foregoing being hereinafter referred to as "proprietary information") which may be used in the business of the Company, whether patentable, copyrightable or not, which (he) may conceive or develop during the term of employment with the Company or in the performance of any services for the Company, alone or in conjunction with others, whether during or out of regular business hours, and whether at the request or upon the suggestion of the Company, or otherwise, **shall be the sole and exclusive property of the Company**, and that (he) will not publish or divulge any of the

proprietary information without the prior written consent of the Company." (emphasis added).

23. In the "Injunctive Relief" section of the Contract, Lash expressly agreed:

> "that any breach **or threatened breach** of any of the terms and/or conditions set forth in the sections . . . entitled "Prohibited Competition", "Confidential Information" or "Ownership of Ideas, Copyrights and Patents" will result in substantial, continuing and irreparable injury to the Company. Accordingly, he . . . (agreed) that, in addition to any other remedy that may be available to the Company, the Company shall be entitled to injunctive or other equitable relief by a court of appropriate jurisdiction in the event of any breach (or) **threatened breach** of the terms of those sections." (emphasis added).

24. In the "Company Property" section of the Contract, Lash agreed that "(u)pon termination of (his) employment with the Company for any reason, (he) agreed(d) to deliver to the Company any property of the Company which may be in (his) possession . . .".

25. At present, the Company has contracted with Rockland Trust Company, Provident Bank, Harris Bank, BMO Financial and AT&T Wireless to provide the Merchandising Manager software as well as other services.

26. On or about December 8, 2003, Lash terminated his employment with the Company, effective immediately, without providing the thirty (30) day notice required by the Contract.

27. Since December 8, 2003, Lash has threatened to compete with the Company's business, solicit the Company's customers and prospective customers and sell the Company's software and related services for his own financial gain.

28. On February 16, 2000, the Company contracted with a domain name registration service named Dotster, Inc. of 11807 Northeast 99th Street, Suite 1100, Vancouver, WA for the internet domain name "rbmtechnologies.com," and RBM Systems has paid all expenses in connection with the same on behalf of the Company.

29. Dotster, Inc. is accredited with the Internet Corporation for Assigned Names and Numbers as a registrar for internet domain names

30. Pursuant to a printout of information from Dotster Inc.'s website, a copy of which is attached to the Verified Complaint and incorporated herein by reference as Exhibit B, the Company is the registrant and owner of the domain name "rbmtechnologies.com" (the "Domain Name").

31. From February 16, 2000 until December 23, 2003, the Domain Name was registered at dotster.com and pointing to the internet address of an internet computer system located at the Company's offices at 25 Mount Auburn Street, Cambridge, Massachusetts while e-mail addresses containing the suffix "@rbmtechnologies.com" were directed to an internet mail service called "Interland," which services the Company's e-mail accounts.

32. On December 23, 2003, approximately two (2) weeks after Lash terminated his employment with the Company, Lash contacted Dotster, Inc. and fraudulently represented himself as still being employed by the Company and still being the "Administrative, Technical Contact" from the Company and redirected both the Domain Name and e-mail addresses for "rbmtechnologies.com" to an unknown site.

33. On December 23, 2003, before Lash redirected the Domain Name and e-mail addresses, when you accessed the Company website by typing "rbmtechnologies.com", you saw the screen attached to the Verified Complaint and incorporated herein by reference as Exhibit C.

34. After Lash redirected the Domain Name and e-mail addresses on December 23, 2003, when you attempted to access the Company website by typing "rbmtechnologies.com",

you saw the screen attached to the Verified Complaint and incorporated herein by reference as Exhibit D.

35. On January 6, 2004, the Company filed its Verified Complaint and Motion for Temporary Restraining Order and Preliminary Injunction.

36. On January 7, 2004, the Court (Chernoff, J.) issued a Temporary Restraining order, enjoining Lash from interfering with the Company's use of its domain name and associated website.

37. On January 9, 2004, the Court (Chernoff, J.) issued a Preliminary Injunction against Lash, enjoining him from interfering with the Company's use of its domain name and associated website.

38. From the time of Lash's conversion of the Company's Domain Name and e-mail addresses on December 23, 2003 until the Court granted the Preliminary Injunction, the Company's customers were unable to visit the Company's website; the Company's employees were unable to send or receive e-mails and customers' e-mails to the Company were being wrongfully intercepted by, and perhaps replied to, by Lash.

39. On December 23, 2003, at approximately the same time Lash commandeered the Domain Name and e-mail addresses for the Company, an as of yet unidentified person misrepresented himself as an RBM Systems' contractor and attempted to switch the RBM Systems' domain name, rbmsystems.com, and e-mail addresses to himself.

40. Upon information and belief, Lash was the person who attempted to redirect RBM Systems' domain name, rbmsystems.com, and e-mail addresses himself.

41. On February 3, 2004, Lash incorporated Savonix as a Massachusetts domestic profit corporation. Lash is the President, Treasurer, Secretary, Assistant Clerk, Vice President, Assistant Secretary and Director of Savonix.

42. Savonix markets internet-based systems to enable retail businesses to manage marketing campaigns throughout their retail locations, and is competing with the Company.

43. The primary products marketed by Savonix are two software programs named Uplink and Upsell.

44. Based on Savonix's marketing materials, Uplink and Upsell are substantially identical to and derived from the Merchandising Manager software owned by the Company.

45. Savonix has partnered with another Massachusetts corporation, Semaphore, Inc. ("Semaphore"), to sell Uplink and Upsell to the financial services industry, a primary target base for the Company.

46. Semaphore is a competitor of the Company in the field of developing merchandising presentations for various services and products offered by retail banks, and has two corporate officers who are former RBM Systems employees.

47. Lash's conduct, as described above and below, is causing the plaintiff immediate and irreparable harm.

## COUNT I - BREACH OF CONTRACT AGAINST LASH

48. The plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1 through 47 above as if each were fully set forth herein.

49. The Contract is a binding contract between the Company and Lash.

50. The Company has lived up to all of its obligations under the Contract, including but not limited to paying Lash and conveying shares of stock to him pursuant to the Contract.

51. Lash has breached the Contract by failing to give the required thirty (30) day notice before terminating the Contract.

52. Lash has breached the Contract by his conversion of the Company's Domain Name and e-mail addresses.

53. Lash has breached the Contract by claiming ownership of the unique Merchandising Manager software.

54. Lash has breached the Contract by refusing to provide the Company with critical information including, but not limited to, user names and passwords, regarding the Merchandising Manager software and related software and operating systems without being paid for the same.

55. Lash has breached the Contract by taking unique demonstration software.

56. Since December 8, 2003, Lash has breached the "Injunctive Relief" section of the Contract by threatening to compete with the Company's business to solicit the Company's customers and prospective customers and to sell the Company's software and related services for his own financial gain in breach of the "Prohibited Competition" section of the Contract.

57. Lash has breached the "Prohibited Competition" section of the Contract, "by own(ing), manag(ing), operat(ing) or control(ing) or be(ing) concerned, connected and employed by, or otherwise associate(ing) in any manner with, engage(ing) in or having a financial interest in (a) business which is directly or indirectly competitive with the business of the Company within the United States of America." In particular, according to Semaphore's Press Release, Lash through his company, Savonix Corporation, "has partnered with" Semaphore to sell the Uplink/Upsell suite of services that provides banks with

information regarding their various branches, floor plans, photo log books and merchandising inventories in direct competition with the Company.

58. Lash has breached the "Confidential Information" section of the Contract with regard to software and other trade secrets owned by the Company. In particular, Lash has provided confidential and proprietary information regarding the Merchandising Manager to Savonix, Semaphore and prospective customers. Lash has also breached the "Confidential Information" section of the Contract by disclosing information concerning the Company's software, specialized programs and code and services and products to competitors and prospective clients of the Company.

59. As a result of Lash's breach of the Contract, the Company has suffered and continues to suffer damages.

60. This is a cause of action by the Company against Lash for breach of contract.

## COUNT II – CONVERSION AGAINST LASH

61. The plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1 through 60 above as if each were fully set forth herein.

62. The Company has a right to possession of the Domain Name, e-mail addresses containing the suffix "@rbmtechnologies.com", usernames and passwords associated with the Merchandising Manager software and related software and operating systems and unique demonstration software.

63. By taking control of the Domain Name, e-mail addresses containing the suffix "@rbmtechnologies.com", user names and passwords associated with the Merchandising Manager software and related software and operating systems and unique demonstration software, Lash has converted the Domain Name, e-mail addresses containing the suffix

10

"@rbmtechnologies .com", user names and passwords associated with the Merchandising Manager software and related software and operating systems and unique demonstration software to his own use by exercising dominion and control over them inconsistent with the Company's ownership rights.

64. As a result of Lash's conversion, the Company has suffered and continues to suffer damages.

65. This is a cause of action by the Company against Lash for conversion.

### COUNT III - MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION AGAINST LASH

66. The plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1 through 65 above as if each were fully set forth herein.

67. Through his former employment with the Company, Lash possesses trade secrets belonging to the Company, including software developed by the Company, client information kept by the Company, access codes and passwords and unique usernames.

68. The Company has taken reasonable steps to preserve the secrecy of the above information.

69. Lash has a duty at common law not to disclose this information or use it for his own benefit.

70. Lash has breached the duty by using this information to take control of the Domain Name and by threatening to use his knowledge of the Company to compete with the Company and solicit its customers.

71. Lash has breached the duty by disclosing trade secrets to Savonix and Semaphore.

72. Lash has unlawfully taken trade secrets with intent to convert them to his own use.

73. Lash's conversion of the Company's trade secrets is in violation of the terms of the

Contract, which is a written employment agreement between the Company and Lash.

74. As a result of Lash's breach, the Company has suffered and continues to suffer damages.

75. This is a cause of action for the taking of trade secrets at common law and under G.L. c. 93 § 42 and for injunctive relief under G.L. c. 93 § 42A.

## COUNT IV - DECLARATORY JUDGMENT

76. The plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1 through 75 above as if each were fully set forth herein.

77. Lash disputes that he is bound by the Contract and consequently required to, among other things, honor the "Prohibited Competition", "Confidential Information," "Ownership of Ideas, Copyrights and Patents" and "Company Property" provisions.

78. The Company takes the position that Lash is bound by all provisions of the Contract.

79. Pursuant to G.L. c. 231A and Mass. R. Civ. P. Rule 57, the plaintiff alleges this cause of action for declaratory relief seeking to have this Court declare that the Contract is in full force and effect and that the defendant is bound by the Contract.

80. An actual controversy has arisen between the plaintiff and the defendant within the meaning of G.L. c. 231A, §1 regarding whether the Contract is in full force and effect and binding on the defendant.

81. The controversies between the parties are justiciable in character.

## COUNT V - VIOLATION OF G.L. C. 272 § 99 (Q) AGAINST LASH

82. The plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1 through 81 above as if each were fully set forth herein.

83. Lash has intercepted e-mail communications intended for use by the Company.

84. The e-mail communications constituted "wire communications" as defined in G.L. c. 277

§ 99 (B) (1).

85. Lash's interception of Company e-mail was not authorized.

86. Lash's interception violated the Company's property or privacy interests in the contents of the e-mails.

87. This is a cause of action for violation of G.L. c. 272 § 99 (Q).

### COUNT VI – PROCURING BREACH OF CONTRACT AGAINST SAVONIX

88. The Plaintiff repeats and realleges each of the allegations set forth in Paragraphs 1- 87 above, as each were fully set forth herein.

89. The Contract was an existing contract in effect between the Company and Lash.

90. Savonix Corporation knew of the existence of the Contract.

91. Savonix induced Lash to break the Contract, through improper motive or means.

92. As a result, the Company has suffered and continues to suffer damages.

93. This is a cause of action against Savonix for procuring breach of Contract.

WHEREFORE, the plaintiff, RBM Technologies, Inc., requests that this Court:

A. Enter judgment in the plaintiff's favor against the defendant;

B. Issue a temporary restraining order and preliminary injunction against the defendants as requested by the plaintiff;

C. Make a declaration that the defendant is bound by the Contract;

D. Grant the plaintiff its costs and reasonable attorney's fees; and

E. Grant such other relief as justice and equity may require.

THE PLAINTIFF HEREBY CLAIMS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.